## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

NEPHEY VALDEZ,

        Plaintiff,

v.                                         Civ.  No. 03-725 JH/RHS

CITY OF BELEN, BELEN CITY
COUNCILORS RONNIE TORRES and
SALLY GARLEY, and PAUL
SKOTCHDOPOLE, in their official
and individual capacities,

        Defendants.

## MEMORANDUM OPINION AND ORDER

In this case Plaintiff Nephey Valdez ("Valdez") claims that the City of Belen ("the City") terminated his employment as a peace officer, resulting in a  violation of his civil rights and a breach of his employment contract.  This matter comes before the Court on Defendant's *Motion and Incorporated Memorandum for Summary Judgment* [Doc. No. 19].  After careful consideration of the parties' arguments, the evidence on file, and the applicable law, the Court concludes that the motion should be GRANTED and summary judgment should be entered in favor of Defendants.

## LEGAL STANDARD

Summary judgment is proper only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Quaker State Minit-Lube, Inc. v. Firemans Fund Ins. Co*., 52 F. 3d 1522, 1527 (10th Cir. 1995) (quoting Fed. R. Civ. P. 56(c)).  All facts and reasonable inferences must be construed in the light most favorable to

the nonmoving party. *Id.* However, it is not required to evaluate every conceivable inference which can be drawn from evidentiary matter, but only reasonable ones. *Lucas v. Dover Corp.*, 857 F. 2d 1397, 1401 (10th Cir. 1988).

Summary judgment is inappropriate if disputes remain as to material facts. *See James Barlow Family Ltd. Partnership v. David M. Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir. 1997). An issue of fact is material if it is essential to the proper disposition of the claim. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In essence, the inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Id.* Nevertheless, a jury question does not exist because of the presence of a mere scintilla of evidence; rather, there must be a conflict in substantial evidence to create a jury question. *Walker v. NationsBank of Florida*, 53 F.3d 1548, 1555 (11th Cir. 1995). The Court will consider Defendant's motion in light of these standards.

## **FACTS**

The material facts presented to this Court, viewed most favorably toward Plaintiff, are as follows. In 1996, Valdez began working as a police officer for the City. In January of 1998, Acting City Manager Sally Garley suspended Valdez from work for a period of five days for fighting. In November of 2001, Valdez received a formal written reprimand for leaving a training session without notifying his supervisor. At some point prior to the spring of 2002, Valdez filed a grievance against defendant Paul Skotchdopole ("Skotchdopole"), the Chief of Police. The record contains no evidence regarding when Valdez filed the grievance, the nature of his complaint against Skotchdopole, or the outcome of the grievance process.

In the spring of 2002, Les Martin and Santos Baca (former members of the City of Belen

police department who are not parties to this case) sent letters and photographs to City of Belen Mayor Ronnie Torres, Belen City Manager Sally Garley, and Yolanda Skotchdopole (wife of defendant Paul Skotchdopole), among others.  Taken together, the letters and photographs implied that the Chief of Police was conducting an inappropriate romantic relationship with Belen City employee Michelle Lovato.

Skotchdopole began an internal investigation in an effort to determine who had sent the letters and photographs.  He discovered a latent fingerprint on the envelope containing the letters and photographs, which was matched to Santos Baca.  On July 12, 2002, Skotchdopole interviewed Mr. Baca, who revealed that he had mailed the letter at the request of Les Martin.  Baca specifically denied that Valdez was involved in the plan to distribute the photos and letters.

On July 12, 2002, Skotchdopole interviewed Valdez regarding the letters and photographs that had been mailed to his wife and to City officials.  Skotchdopole interviewed Valdez because he knew that Valdez was a close friend of Les Martin.  Mary Lucy Baca, the City of Belen Human Resources Manager, was present for the interview.  During the course of the interview, the following exchange took place:

> Skotchdopole ("S"): I'm going to show you some evidence I have in this case and I want you to tell me if you recognize any of it.  Do you recognize that envelope?
> Valdez ("V"): No sir, I don't.  Other than it's a manila envelope.
> S:      Do you know anything about that envelope?
> V:      No sir, I don't.
> S:      Do you see who that envelope is addressed to?
> V:      Yes sir, I do.
> S:      And you don't know anything about it?
> V:      No sir, I don't.
> S:      I'm going to show you a series of photographs.  I want you to tell me whether you recognize those photographs.
> * * *
> S:      Have you ever seen those photographs before?

V:    No sir, I have not.
S:    Did you take those pictures?
V:    No sir, I have not.
S:    You didn't take those pictures?
V:    No sir, I did not.
S:    Do you know who did take those pictures?
V:    No sir, I do not.
S:    Have you ever seen this letter before?
V:    No, sir.  No, sir.

* * *

S:    Do you have any clue where those letters would have come from?
V:    No sir, I don't.

* * *

S:    You don't have any knowledge whatsoever with any of this stuff?
V:    No, sir.
S:    The time to come clean is right now, Nephey.
V:    No sir, I'm being honest with you.
S:    You're going down on record saying that you don't know anything about this at all.
V:    I've heard a lot of rumors just like you have.  I mean, I've heard a lot of rumors.
S:    What have you heard about these letters and these photos?
V:    Just that there was being letters sent and there was also another letter trying to overthrow you or something.  I never seen these letters.
S:    Who did you hear that rumor from?
V:    Everybody here in the office.

* * *

S:    ....You know, don't tell me that you didn't know anything about this.
V:    Well, I knew about the letters but I had never seen them.
S:    OK, what did he [Les Martin] tell you about those letters?
V:    Just that there was letters being sent to city hall and to Conroy Chino.  I didn't know anything about them sending the letter to your wife.  I had no  idea.  That must have been when I was gone on vacation for those days, for my class reunion.  I had no idea.
S:    When did Les tell you this stuff about the letters?
V:    About a month or so ago.[1]

--------------------------------

[1] Interestingly, at his deposition on January 12, 2004, Valdez again initially denied having any knowledge regarding the letters and photographs.  Valdez Depo. at pp. 46-47.  After counsel for Defendants reminded Valdez of his testimony during the internal investigation in which he admitted knowing about the letters and photographs, Valdez admitted that he had known about them.  Id. at pp. 48-50.

4

On July 15, 2002, Skotchdopole placed Valdez on administrative leave with pay pending the outcome of the internal investigation.  In the meantime, Skotchdopole prepared a report regarding his investigation of the letters and photos that summarized each interview he conducted. In the report, Skotchdopole states that "Due to my personal involvement, I have decided to leave to others the decision of whether and what disciplinary action should be imposed, although I do believe that some disciplinary action is warranted."   The report further states that Skotchdopole is turning the investigation over to Mary Lucy Baca for independent review and for a recommendation for disciplinary action to the City Manager.  The record contains no evidence of further involvement by Skotchdopole in the investigation or disciplinary process.

On August 26, 2002, Ms. Baca provided Valdez with a written Notice of Recommendation for Disciplinary Action based upon his violation of various City policies and procedures.  Among the reasons listed were (1) the making of false statements in the internal investigation by initially stating that he knew nothing about the letters and photos, and then later revealing that Les Martin had told him about them, (2) insubordination, failure to report misconduct, and failure to display respect for a superior officer, all stemming from Valdez's failure to report what he knew about the letters or take other action to prevent their dissemination, and (3) gossiping.

On September 4, 2002, City Manager Sally Garley sent Valdez a Notice of Intent to Terminate, stating "I have concluded that it is in the best interest of the City of Belen to terminate your employment."  The letter also informed Valdez of his right to a pre-disciplinary hearing.  On September 9, 2002, attorney John James D'Amato, Jr. informed City officials of Valdez's request for a disciplinary hearing.  That hearing took place on September 17, 2002.  Valdez and his attorney had notice of the hearing, attended, and had the opportunity to speak.  On September 23, 2002, Ms.

5

Garley notified Valdez of her decision that his employment should be terminated and informed him of his right to appeal her decision to a hearing officer.  Valdez exercised that right, and beginning November 17, 2002, a post-termination hearing was held before Hearing Officer James Ashe.  Again, Valdez was represented by counsel at the hearing and had the opportunity to present evidence, cross-examine witnesses, and make factual and legal arguments.  Mr. Ashe upheld the decision to terminate Valdez's employment, finding that Valdez had violated City policies and procedures and that his termination did not violate Valdez's First Amendment right to free speech.

## DISCUSSION

In his Complaint against the City, Valdez alleges claims for breach of contract, violation of his right to privacy, defamation[2], negligent training, denial of due process, violation of his right to freedom of speech, violation of his right to free association, and prima facie tort.  The City has moved for summary judgment on each claim, which the Court will address in turn.

## I.     BREACH OF CONTRACT

Valdez contends that Defendants breached his contract of employment by (1) failing to follow the progressive discipline policy contained in the City's personnel and procedures manual, and (2) discharging him without good cause.  Complaint at ¶¶ 31-39.  However, Defendants respond that Valdez's claim is precluded by the doctrine of collateral estoppel because the propriety of Valdez's termination has already been litigated by an administrative tribunal.

Applying the principles of collateral estoppel, or issue preclusion, to decisions of state administrative bodies serves to promote federalism, conserve judicial resources, and encourage parties

---

[2]Plaintiff has dismissed this cause of action.

to minimize the expense and burden of repetitive litigation.  *See Univ. of Tenn. v. Elliott*, 478 U.S. 788, 798, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986).  Thus when a state agency (1) acts in "a judicial capacity"; (2) resolves "disputed issues of fact properly before it"; and (3) the parties have had "an adequate opportunity to litigate" the issue, a federal court will grant the state agency's decision preclusive effect to the extent that it would have received preclusive effect in state court.  *Id.* at 799, 106 S.Ct. 3220 (quotation omitted).

It appears that all three of these criteria are met here.  The Hearing Department for the City of Belen did act in a judicial capacity by conducting a post-termination hearing regarding Mr. Valdez in which witnesses provided testimony, and Mr. Valdez was represented by counsel who had the opportunity to cross-examine the City's witnesses as well as to present evidence on his client's behalf.  At the conclusion of the hearing, the hearing officer issued a written decision that included findings of fact and conclusions of law, and therefore he explicitly resolved disputed factual issues.  Finally, both Valdez and the City had an adequate opportunity to litigate the issue of the propriety of Valdez's termination.  *Elliott* is satisfied.

Once a New Mexico state administrative hearing satisfies *Elliott*'s three requirements, this Court should then look to New Mexico law to determine whether issue preclusion is proper.  New Mexico courts apply collateral estoppel to administrative hearings provided: "(1) the party against whom collateral estoppel is asserted [was] a party in or in privity with a party to the original action; and (2) the two cases [ ] concerned the same ultimate issue of fact, which was (a) actually litigated, and (b) necessarily determined in the first suit."  *DeLisle v. Avallone*, 117 N.M. 602, 874 P.2d 1266, 1269 (1994).  If the party invoking the doctrine provides sufficient evidence to meet all elements of this test, it establishes a prima facie case.  *See Shovelin v. Central New Mexico Elec. Cooperative,*

7

*Inc.*, 115 N.M. 293, 850 P.2d 996, 1000 (1993).  At that point, the "burden shifts to the party

opposing collateral estoppel to show that he or she was not afforded a full and fair opportunity to

litigate the issue in the prior proceeding." *Padilla v. Intel Corp.*, 125 N.M. 698, 964 P.2d 862, 865

(1998).

Again, these criteria have been met.  Collateral estoppel is being asserted against Valdez, who

was a party in the original administrative action.  In addition, the two cases concern the same ultimate

issue of fact: that is, whether the termination of Valdez's employment was for just cause and therefore

in compliance with his employment contract.  As the hearing officer's written opinion demonstrates,

this issue was actually litigated and necessarily determined at the administrative hearing.[3]  Therefore,

Defendants have made a prima facie case and the burden shifts to Valdez to show that he was not

afforded a full and fair opportunity to litigate the issue in the prior proceeding.  Valdez has not made

such a showing.  Accordingly, the doctrine of collateral estoppel applies and summary judgment

should be granted in favor of Defendants.

Valdez also argues that the City violated his employment contract by failing to follow its

progressive discipline policy.  However, the undisputed facts are that the policy states that:

> A regular employee shall be progressively disciplined **whenever
> possible**.  Each case of inadequate performance or act of misconduct
> shall be judged individually.   The steps of corrective action used
> depend on the severity of the infraction and the employee's previous
> work record.  Because of the serious nature of some infractions, the
> first disciplinary action may be dismissal.

City of Belen Personnel Policies and Procedures, Defendants' Ex. P, § 8.2 (emphasis in original).

---

[3] The hearing officer expressly considered the City of Belen Personnel and Procedures
Manual and the Police Department's Standard Operating Procedures, which as Plaintiff has
alleged (Complaint at ¶ ¶ 31-39) constitute the employment contract in this case.

Thus, the policy affords the City the flexibility to use more serious corrective action even for a first offense.  Furthermore, it is undisputed that on two prior occasions Valdez had received discipline in the form of a warning and a suspension, and therefore he was not terminated for his first offense. There is no evidence of a failure to follow the progressive discipline policy.

## II.      INVASION OF RIGHT TO PRIVACY

In his Complaint, Valdez alleges that Defendants invaded his privacy by questioning him about his off-duty conduct (in particular conversations he had with Les Martin) during the course of the internal investigation.

The Tenth Circuit Court of Appeals has noted that "[w]hile the Constitution does not explicitly establish a right of privacy, the Supreme Court has recognized for nearly 100 years that a right of personal privacy does exist." *Eastwood v. Dep't of Corrections of the State of Oklahoma*, 846 F.2d 627, 630 (10th Cir. 1988) (citing *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Union Pacific Ry. Co. v. Botsford*, 141 U.S. 250, 11 S.Ct. 1000, 35 L.Ed. 734 (1891)).  "As the Court noted in *Roe*, the 'roots' of the right of privacy have been found in the First Amendment, in the Fourth and Fifth Amendments, in the general penumbra of the Bill of Rights, and in the Fourteenth Amendment's concept of personal liberty and restriction upon state action." *Id.* at 630 n. 1 (citing *Stanley v. Georgia*, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969); *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); *Roe*, 410 U.S. at 153, 93 S.Ct. 705). The *Eastwood* court noted that two kinds of privacy interests are protected:

> the individual's interest in avoiding disclosure of personal matters and

> the interest in being independent when making certain kinds of personal decisions. The first interest protects the individual from governmental inquiry into matters in which it does not have a legitimate and proper interest. "The right to be left alone," the Supreme Court has said, is "the right most valued by civilized men."

*Id*. at 630-31 (citing *Whalen v. Roe*, 429 U.S. 589, 599, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977) (internal quotations omitted)).  The *Eastwood* court found that "[t]his constitutionally protected right is implicated when an individual is forced to disclose information regarding personal sexual matters." *Id*. at 631; *see also Thorne v. City of El Segundo*, 726 F.2d 459, 468 (9th Cir.1983) ("[T]he privacy of her sexual activities are within the zone protected by the Constitution."); *United States v. Westinghouse Elec. Corp.*, 638 F.2d 570, 577 (3d Cir.1980) (information regarding one's body and health is a matter that the individual is ordinarily entitled to keep private).

Valdez's claim of an invasion of his right to privacy simply does not fall within the zone of protected activities as described in *Eastwood*, *Whalen*, *Roe*, *Botsford*, *Griswold*, or *Thorne*. Although Plaintiff claims that Defendants invaded his privacy by questioning him regarding his off-duty conduct (Complaint at ¶ 45), he comes forward with no evidence that Defendants questioned him regarding personal sexual matters, his health, or other intimate personal issues.  Rather, it is undisputed that Skotchdopole questioned Valdez about his conversations with Les Martin and others regarding the letters and photographs, as well as conversations he may have had regarding rumors about Skotchdopole and Lovato.  In fact, Plaintiff has admitted in his deposition that asking him questions about the letters and photographs did not invade his privacy.  Defendant's Ex. H (Valdez Depo.) at pp. 93-94.  Accordingly, Defendant's motion for summary judgment should be granted.

10

### III.    NEGLIGENT TRAINING, SUPERVISION, AND INVESTIGATION

Next, Valdez alleges that Defendants were negligent in conducting the internal investigation into the letters and photos, as well as in training and supervising its officers to conduct such investigations, and that as a proximate cause of these failings, he suffered harm.  Although the scope of this claim is somewhat ambiguous, from Valdez's response brief it appears that he is claiming that the City is at fault for failing to address the accusations against Skotchdopole and Lovato immediately in January of 2002, when Mayor Ronnie Torres first received anonymous letters containing allegations of a sexual relationship between the pair.

The Supreme Court has concluded that government entities can be held liable only when an injury is inflicted by the government's "'lawmakers or by those whose edicts or acts may fairly be said to represent official policy.'"  *City of St. Louis v. Praprotnik*, 485 U.S. 112, 117 (1988) (quoting *Monell*, 436 U.S. at 694).  The Court explained that requiring a plaintiff to "[l]ocat[e] a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality."  *Board of County Comm'rs v. Brown*, 520 U.S. 397, 403-04 (1997) (citation omitted).  If an alleged violation "cannot be characterized as official policy then [a city] can still be held liable if the practice is 'so permanent and well settled as to constitute a custom or usage with the force of law.'"  *Lankford v. City of Hobart*, 73 F.3d 283, 286 (10th Cir. 1996) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 168 (1970)); *see also Brown*, 520 U.S. at 403-04.  "In order to establish a custom, the actions must be 'persistent and widespread . . . practices of city officials.'"  *Lankford*, 73 F.3d at 286 (quoting *Starrett v. Wadley*, 876 F.2d 808, 818 (10th Cir. 1989)).

It is not enough for a plaintiff merely to identify conduct properly attributable to a

11

governmental entity by pointing to a policy or custom adopted or approved by an appropriate party.

A plaintiff also must show that the entity's action or inaction resulted from "deliberate indifference

to the rights of the plaintiff." *Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir. 1996); *see also Brown*,

520 U.S. at 407.   To satisfy this culpability requirement, a plaintiff must show that the entity's action

or failure to act "reflects a 'deliberate' or 'conscious' choice by a municipality." *City of Canton v.*

*Harris*, 489 U.S. 378, 389 (1989).

In addition to "deliberate indifference," a plaintiff also must demonstrate that governmental

entity "was the 'moving force' behind the injury alleged.  That is, a plaintiff must . . . demonstrate a

direct causal link between the . . . action and the deprivation of federal rights." *Brown*, 520 U.S. at

404; *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986).  To be the "moving force,"

there "must at least be an affirmative link between the . . . inadequacies alleged, and the particular

constitutional violation at issue." *Oklahoma City v. Tuttle*, 471 U.S. 808, 824 n.8 (1985).  The

Supreme Court has held, "Where a plaintiff claims that the municipality has not directly inflicted an

injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and

causation must be applied to ensure that the municipality is not held liable solely for the actions of

its employee." *Brown*, 520 U.S. at 405 (citing *Canton*, 489 U.S. at 391-92) (additional citations

omitted).

Valdez has not satisfied this stringent standard.  He has failed to bring forth evidence to

demonstrate a direct causal link between the Mayor's failure to initiate an investigation in January of

2002 and the termination of his employment.  Indeed, it was Valdez's own actions that led to his

termination, not those of the Mayor.  Summary judgment should be granted.

## IV.    DENIAL OF DUE PROCESS

In this cause of action, Valdez alleges that prior to the termination of his employment, Defendants failed to provide him with a fair procedural process and deprived him of property without due process of law.  Complaint at ¶¶ 60-62.

As concerns the amount of due process constitutionally required in a pre-termination hearing, in *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 546, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), the Supreme Court spoke as follows:

> The essential requirements of due process, and all that respondents seek or the Court of Appeals required, are notice and an opportunity to respond.  The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement. The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story. To require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee.

(citations omitted).  In this case, the pre-termination hearing conducted by City Manager Sally Garley on September 17, 2002 satisfied the requirements of *Loudermill*.  Valdez presents no evidence to support a claim that he did not receive notice at the hearing, notice of the charges against him, an explanation of his employer's evidence against him, or an opportunity to present his side of the story.

However, Valdez makes a somewhat different argument in his brief in response to the motion for summary judgment.  Citing *In re Murchison*, 349 U.S. 133, 75 S. Ct. 623 (1955), Valdez argues that "the procedures employed in the investigation were so inappropriate that a fact-finder could reasonably conclude that plaintiff's substantive Due Process [sic] were violated."  Although plaintiff does not fully explain this argument, one may infer that he is referring to the fact that Skotchdopole conducted the investigation into the source of the letters and photos, when he was the subject of

13

those letters and photos.   Certainly, if Skotchdopole had terminated Valdez's employment and conducted the pre-termination hearing, then *Murchison* would be relevant.   However, the undisputed facts are that the City of Belen Human Resources Manager, Mary Lucy Baca, was present for all but one of the interviews conducted by Skotchdopole, and she made a recommendation of termination to the City Manager, who carried out that termination and conducted the pre-termination hearing. The record contains no evidence that Skotchdopole's participation extended beyond the conduct of the investigation.   And, though Valdez testified that he believed that Skotchdopole had unfairly pre-judged the situation, he admitted that this was merely an assumption on his part.   Valdez Depo. at pp. 99-100, 105.   Without more, no reasonable jury could conclude that Skotchdopole deliberately skewed his investigation.

Defendants' motion for summary judgment should be granted.

## V.       DENIAL OF RIGHT TO FREEDOM OF SPEECH

The scope of Valdez's claims under the First Amendment are unclear.   It appears that Valdez is claiming that his communications with Defendants—specifically, his unspecified grievance regarding Skotchdopole filed sometime before the internal investigation took place—constituted free speech on matters of public concern protected by the federal and New Mexico constitutions.

The Supreme Court has recognized the right of employees to speak on matters of public concern, typically matters concerning government policies that are of interest to the public at large, a subject on which public employees are uniquely qualified to comment.   *See Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 U.S. 563, 88 S. Ct. 1731, 20 L. Ed.2d 811 (1968).   Outside of this

14

category, the Supreme Court has held that when government employees speak or write on their own time on topics unrelated to their employment, the speech can have First Amendment protection, absent some governmental justification "far stronger than mere speculation" in regulating it. *United States v. Treasury Employees*, 513 U.S. 454, 465, 475, 115 S. Ct. 1003, 130 L. Ed.2d 964 (1995).

Valdez's claim will not survive summary judgment for several reasons. First, there is no admissible evidence in the record regarding the precise nature of the grievance Valdez filed against Skotchdopole. In the absence of such evidence, it is impossible to determine if the speech contained in the grievance touched upon a matter of public concern. Second, the record contains no evidence to support a causal link between Valdez's filing of the grievance and the termination of his employment. Not only does Valdez admit a lack of direct evidence of causation (Valdez Depo. at pp. 99-100, 105), but the record is devoid of circumstantial evidence (such as proximity in time, the nature or severity of the accusations in the grievance, or the outcome of the grievance) that might support the inference of a causal link.

In addition, if Valdez contends that the protected "speech" is that contained in the letters sent to various City officials and Yolanda Skotchdopole, Valdez has admitted that is not his speech. As a result, Valdez has no First Amendment rights arising from that speech. Valdez argues that Defendants violated his First Amendment rights "because they conducted an unreasonable investigation to determine that he was an alleged co-conspirator with the author or the letters and photographs as well as his purported role in initiating and circulating rumors concerning the Chief of Police." Plaintiff's Response Brief at p. 14. Valdez relies upon *Waters v. Churchill*, 511 U.S. 661, 114 S. Ct. 1878 (1994) for this argument, but as he admits, the rationale of *Waters* does not apply here. And again, there is no evidence of a causal relationship between this speech by third parties and

the termination of Valdez's employment.  Rather, the undisputed evidence is that Defendants terminated Valdez because he lied during an internal investigation.  Defendants' motion for summary judgment should be granted.

## VI.     DENIAL OF RIGHT TO FREEDOM OF ASSOCIATION

The thrust of Valdez's claim here is that Skotchdopole improperly implicated him in a conspiracy based upon his friendship or association with third parties, e.g., Les Martin and Santos Baca, who sent the letters and photos to Yolanda Skotchdopole and members of City government.

The Supreme Court has recognized two types of association protected by the First Amendment:

> In one line of decisions, the Court has concluded that choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme. In this respect, freedom of association receives protection as a fundamental element of personal liberty. In another set of decisions, the Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment--speech, assembly, petition for the redress of grievances, and the exercise of religion.

*Roberts v. United States Jaycees*, 468 U.S. 609, 617-18, 104 S.Ct. 3244, 3249, 82 L.Ed.2d 462 (1984).  Although Valdez does not address this claim in his response to Defendants' motion for summary judgment, it appears that he contends that in retaliation for his friendship with Les Martin as well as in retaliation for filing a grievance against the Chief, Skotchdopole improperly implicated him in the scheme to send the letters and photos.

To prevail under his free association claim, Plaintiff must establish causation—that is, that his association with Les Martin and Santos Baca was a "motivating factor" behind his termination. *Saye*

*v. St. Vrain Valley Sch. Dist.*, 785 F.2d 862, 867 (10th Cir. 1986).  Plaintiff has failed to present sufficient evidence to create a genuine issue of fact regarding whether that association was a motivating factor behind the termination of his employment, and therefore summary judgment is appropriate.

## VII.   PRIMA FACIE TORT

Governmental entities and public employees, while acting within the scope of duty, are granted immunity from liability from tort except as waived by the specific provisions of the Tort Claims Act. NMSA 1978, § 41-4-4(A) (1976, prior to 2001 amendment).  Each of the defendants, including the individuals sued in their official capacities, is within the definitions of "governmental entity" and "public employee."  *See* NMSA 1978, § 41-4-3(B), (F) (1995).  Prima facie tort is not included in the specific provisions of the Tort Claims Act and, therefore Defendants enjoy immunity from Valdez's claim.  *See* NMSA 1978, §§ 41-4-5 to -12 (1976, as amended through 1991). Accordingly, the Defendants are entitled to summary judgment in their favor.

However, the question remains as to the viability of Valdez's claim for prima facie tort against the individuals in their individual capacities.  "The elements of a prima facie tort ... are (1) an intentional, lawful act, (2) committed with the intent to injure the plaintiff, (3) causing injury to the plaintiff, and (4) the absence of justification for the injurious act."  *Padwa v. Hadley*, 1999-NMCA-067, ¶ 24, 127 N.M. 416, 981 P.2d 1234.  Based upon the evidence currently before the Court, no reasonable jury could find for Valdez on his claim for prima facie tort, and the motion for summary judgment should be granted.

IT IS THEREFORE ORDERED that Defendant's *Motion and Incorporated*

*Memorandum for Summary Judgment* [Doc. No. 19] is GRANTED.


_____
UNITED STATES DISTRICT JUDGE